IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ETHAN TANNEN, CAROLYN E. GRAY, and KAREN CELLI, on behalf of themselves and all persons similarly situated, | : <br> : <br> : No. _____ <br> : |
| *Plaintiffs*, | : <br> : |
| v. | : <br> : |
| | : Class Action |
| THE SCHOOL DISTRICT OF PHILADELPHIA, | : <br> : Jury Trial Demanded <br> : |
| *Defendant* | : <br> : |

## **CLASS ACTION COMPLAINT**

**I.  INTRODUCTION**

1. On two broiling-hot days in August 2021, before students returned to school, virtually the entire teaching staff of the Julia R. Masterman Laboratory and Demonstration School ("Masterman") in Philadelphia, reported to work and performed their assigned tasks on an outside patio that is part of the school. They sought to bring attention to the failure of the School District of Philadelphia (the "District") to provide Masterman teachers and parents complete information about asbestos remediation efforts at Masterman, and the potential danger that asbestos inside the school building posed to their students and to themselves. The demonstration drew press attention and embarrassed the District, but the Plaintiffs fulfilled all of their job duties while they worked outside on those two days.

1



Photos by Dale Mezzacappa / Chalkbeat

2. Throughout the day on August 26, 2021, supportive parents and community members—joined by two members of Philadelphia City Council—demonstrated in front of the school while the teachers worked on the concrete patio outside the school's entrance.



3. During breaks from their workday, the teachers spoke with the press and the parents who gathered outside the school and with the public officials who came to support their efforts.

4. The District knew that the teachers were doing their work. The District also knew that the teachers' protest was attracting a lot of attention from the press. Early in the day, District officials travelled to Masterman from District headquarters to order the teachers to go inside in an attempt to end the protest and the press attention. When the teachers kept working outside, the District retaliated by disciplining the protesting teachers for "unauthorized absences" and docking their pay

5. The teachers have petitioned the District over and over again to rescind the retaliatory discipline, but the District has refused. The teachers therefore bring claims under the First Amendment to the United States Constitution for declaratory and injunctive relief to clear their records and for damages.

## II.   JURISDICTION AND VENUE

6. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343(a)(3) and (4).

7. Venue is proper in the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1391(b) because the events or omissions giving rise to this action occurred in the District, and the parties either reside or are subject to personal jurisdiction in the District.

## III.   THE PARTIES

8. Plaintiff Ethan Tannen is an adult resident of Philadelphia, PA. Since August 2018, he has been a Math teacher employed by the District and assigned to Masterman, where he has taught grades 7-12.  He was written up by the District for unauthorized absences for August

26 and 27, 2021, and lost pay for those two days.

9. Plaintiff Carolyn E. Gray is an adult resident of Philadelphia, PA. She is an award-winning, 5th grade Science teacher at Masterman who has been teaching for 55 years. She was written up by the District for unauthorized absences for August 26 and 27, 2021 and lost pay for those two days.

10. Plaintiff Karen Celli is an adult resident of South Jersey. Until her retirement in June 2023, she was a Philadelphia School District teacher for 28 years, almost all of which tenure she spent at Masterman as a 6th grade teacher of Social Studies, English and Language Arts. She was written up by the District for unauthorized absences for August 26 and 27, 2021 and lost pay for those two days.

11. Defendant School District of Philadelphia (the "District") is a school district within the Commonwealth of Pennsylvania organized pursuant to the Public School Code of 1949, Act of March 10, 1949, P.L. 30, as amended, 24 Pa. Stat. §§ 1-101, et seq. The District's headquarters and principal place of business is located at 440 N. Broad Street, Philadelphia, PA 19130.

IV. **FACTUAL BACKGROUND**

12. The District serves over 197,000 students and directly operates 217 schools. A large percentage of the District's school buildings were constructed before World War II.

13. The building that now houses Masterman was built in 1933. Like other buildings of that era, the Masterman building was constructed and for decades maintained using building materials that contained asbestos.

14. Asbestos became a popular commercial product because it is strong, does not burn, resists corrosion, and insulates well. Its commercial use in the United States began in the early 1900s, when it was used as insulation in steam engines. Since then asbestos has been used

to create about 3,000 different products, including insulation and fireproofing. The peak years of asbestos use in schools were from World War II until the 1970s.

15. Asbestos was most commonly used in schools as insulation and in building materials. It has also been used in floor and ceiling tile, cement asbestos pipe, corrugated paper pipe wrap, acoustical and decorative insulation, pipe and boiler insulation, and spray-applied fireproofing. The fluffy white substance you may find above a dropped ceiling, for example, is one type of spray-applied material.

16. Various asbestos products have been identified in the Masterman building include floor tile, pipe insulation, radiator insulation, and plaster walls.

17. Intact and undamaged asbestos materials generally do not pose a health risk. But when asbestos materials are torn or broken, they can release tiny airborne fibers. If the fibers are inhaled, they can lead to health problems, including cancer.

18. The potential for an asbestos-containing material to release fibers depends primarily on its condition. If the material, when dry, can be crumbled by hand pressure – a condition known as "friable" – it is more likely to release fibers, particularly when damaged. Some common examples of friable asbestos are acoustic ceilings and tiles, and any types of plasters, wallboard, joint compound or "mud" and thermal insulation for water heaters and pipes.

19. Exposure to airborne asbestos dust can lead to fatal illnesses, including mesothelioma, asbestosis and lung cancer. Unfortunately, there is no safe level of exposure, which is why asbestos is so dangerous.

20. The U.S. Department of Health and Human Services, the Environmental Protection Agency, and the International Agency for Research on Cancer classify asbestos as a known human carcinogen.

21. Acting on this concern, Congress passed the Asbestos Hazard Emergency Response Act (AHERA) in 1986 to protect school children and school employees from exposure to asbestos in school buildings.

22. AHERA requires school districts to inspect schools for asbestos-containing building material and prepare management plans that make recommendations for the reduction of asbestos hazards through remediation or abatement.

23. The District maintains a website where it publishes some AHERA reports and other information related to identification and remediation of asbestos in Philadelphia schools, www.philasd.org/capitalprograms/environmental/ahera/. But most of the District's information about asbestos management and remediation is not available online.

24. The latest AHERA report published for the Masterman school building, which is from the 2018-2019 school year, identified over 100 "confirmed" or "assumed" sources of asbestos in the building.

25. Parents of Masterman students and Masterman teachers have been demanding more information from the District about asbestos at Masterman since at least January 2020. Much of that effort has been organized through the Masterman Home and School Association ("HSA"). The Masterman HSA is an unincorporated non-profit, non-sectarian, and non-partisan organization run by parents that promotes cooperation between home, school, and community. The Masterman HSA has worked closely with the Philadelphia Federation of Teachers' (PFT) environmental director, to attempt to understand the risks of asbestos exposure in the Masterman building.

26. Masterman parents and teachers have grown increasingly concerned about the safety of Masterman over the past few years, demanding more information from the District

about potential hazards in the building. As their concern has grown, so has their frustration with the difficulty of obtaining information about asbestos management from the District. Parents at Masterman have resorted to filing Right-to-Know requests with the district to obtain information on building conditions.

27. During the 2020-21 school year, the Masterman HSA, working with Masterman teachers and the PFT's environmental director, demanded information about more than 60 areas of damaged asbestos in Masterman revealed in district documents and federal asbestos inspection reports that were not remediated in the manner or to the extent recommended by inspectors.

28. Masterman parents met with district officials in July 2021 — after receiving a trove of asbestos and lead-related documents in response to their Right-to-Know requests — to obtain more information concerning all of the potentially hazardous areas of the school building and to find out whether abatement efforts were underway.

29. The Masterman parents and teachers demanded that the District release all environmental documents, reports, and other information related to asbestos, and they wanted clearer answers about conditions at Masterman and at any other school where environmental hazards may be present. They also asked for better cooperation from the administration with the PFT, which had sued the District in 2020 over what it said was a failure to address asbestos and other environmental concerns in the schools.

30. The District repeatedly refused the demands of the Masterman parents and teachers.

31. The Masterman parents and teachers were under pressure. Most Masterman students had been out of the Masterman building since March 2020. They were set to return to the building on Tuesday, August 31, 2021. But the parents and teachers did not believe they had

enough information about asbestos hazards at Masterman to assure them that the building was not dangerous to students and staff.

32. The Masterman parents and teachers felt they needed to make their appeal more strongly and more publicly. They decided to put on a very public protest in conjunction with the start of the 2021-22 school year.

33. On Wednesday, August 25, 2021, 50 members of the school staff sent a letter to the District and the Mayor, explaining that they planned to work outside the building the following day in order to dramatize demands around transparency and environmental safety. They also sent the letter to the press, and called for community members to join the protest for transparency and environmentally safe schools . Local community groups echoed those calls.

34. On August 26 and 27, 2021, Masterman teachers were scheduled to work, but not to teach. For most teachers, their responsibilities were to attend virtual professional development sessions and prepare for the start of classes the next week. All of the Masterman teachers came to school those two days and fulfilled those responsibilities. A few teachers were scheduled to assist with programming for new students inside the school building; the teachers who had those responsibilities fulfilled them.

35. The teachers whose work responsibilities did not require them to be in the school building signed in, as usual, but then did their work on the concrete patio outside the main entrance. They set up tents to protect them from the sun and ran extension cords through windows to power their laptops while they connected to the school's Wi-fi.

36. The outside patio is routinely used by teachers during the workday. It is treated by all staff as part of the school space, being available for use for teacher prep-time and lunch during warm weather and for organized, school-related activities such as the annual graduation

reception.

37. Throughout the day, while the teachers worked on the patio, the HSA provided water for the teachers and supportive parents and community members demonstrated in front of the school. During breaks from their workday, the teachers would speak with the press and the parents who gathered outside the front entrance and with the public officials who came to support their efforts. The teachers thus communicated their concerns verbally, but also through their expressive conduct of working outside the building. In short, the teachers' presence on the patio was their message: they did not believe the building was safe for the students and for them. And they sought to alert the public to those dangers.

38. The teachers' action was not organized by or associated with the Philadelphia Federation of Teachers, but the Union issued a statement in support of their efforts, stating "while this is not a PFT-organized action, we share the Masterman community's concerns that we do not have the information needed to accurately verify the safety of the building. We have repeatedly asked for specific documents and have been stonewalled every step of the way. Our goal has always been ensuring the safety of buildings for staff and students alike."

39. Once it became apparent that the teachers' presence outside was the subject of press attention, Masterman and District administrators (including Chief of Schools Dr. Evelyn Nunez) ordered the teachers to move inside the building. Those orders were issued pursuant to decisions of policy made by the District, and ratified by the District.

40. There was no reason for those orders other than to cut off the teachers' communication with the press and the public. Teachers regularly make use of the patio and, when available, the roof of the Masterman building when they were not in class, and sometimes meet with students or conduct academic activities on the patio or the roof. There was nothing

9

improper about the teachers working on the patio rather than inside the building on the days in question. No Masterman teacher has previously been disciplined for working outside.

41. The teachers who did not have specific duties inside the building on August 26 and 27, 2021 remained outside the building for those two days and were punished for their protest. Despite their presence at the school and their completion of all of their work responsibilities, the teachers were issued F-61s, Unauthorized Leave Without Pay notices.

42. Each teacher received an email for each day they worked outside, stating that "because you failed to report to your work location as directed by District officials] … you will be coded F-61(unauthorized leave) for the day. You are advised that failure to follow directives in the future may result in additional disciplinary action."

43. The teachers lost pay for the days they worked outside. For some, the reduction in pay may have affected their pensions and other employment benefits, and the unwarranted disciplinary marks remain on all of their records to this day.

44. The Masterman teachers who were docked pay for the day promptly filed a grievance through the union building representative. They did not get a response to that grievance for over a year, when they learned it had been denied.

## V. CLASS ACTION ALLEGATIONS UNDER RULE 23

45. Plaintiffs Ethan Tannen, Carolyn Gray and Karen Celli bring this action on behalf of themselves and all others similarly situated pursuant to Federal Rules of Civil Procedure Rule 23(a) and 23(b)(l), (b)(2), and (b)(3), as representatives of the following Class:

> All persons who, on August 26, 2021 and/or August 27, 2021 were employed at the Julia R. Masterman School and who worked on

      school premises but outside the building one or both days but were,

      for one or both days, issued an F61 notice of Unauthorized Absence.

46. The identity and of the members of the Class will be easily ascertainable from the records of Defendant.

47. **Numerosity. Fed. R. Civ. P 23(a)(1).** At this time, Plaintiffs do not know the exact number of members of the Class. Plaintiffs believe the class consists of approximately 50 individuals. Thus, the class is so numerous that joinder of all members is impracticable.

48. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of—indeed, identical to—the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative Class. All are based on the same facts and legal theories.

49. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the Class because their interests coincide with, and are not antagonistic to, the interests of the members of the Class; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them not to vigorously pursue this action.

50. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2) and 23(b)(3).** Common questions of law and fact exist as to all members of the Class, and there are no factual or legal issues that differ between the putative class members. These questions will predominate over the questions affecting only individual class members. The common questions include:

51. Whether the Masterman teachers were speaking about a matter of public concern when they protested to bring attention to the dangers of asbestos and the District's lack of transparency around asbestos remediation efforts.

52. Whether the Masterman teachers were speaking as citizens, rather than as government employees when they protested to bring attention to the dangers of asbestos and the District's lack of transparency around asbestos remediation efforts.

53. Whether the District's desire to end the Masterman teachers' protest was a motivating factor in its decision to order the teachers to work inside on August 26 and 27, 2021.

54. Whether the District's desire to retaliate against the Masterman teachers for their protest was a motivating factor in its decision to dock the teachers' pay on August 26 and 27, 2021.

55. Whether the District's interest in the efficiency of the public services it performs outweighs the teachers' interest in commenting upon matters of public concern.

56. **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are so small that that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendant's conduct. By contrast, the

class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

57.     **Declaratory Relief and Injunctive Relief**. **Fed. R. Civ. P. 23(b)(2).** Defendant has acted or refused to act on grounds that apply generally to the class, rendering declaratory relief appropriate respecting the class as a whole.

## VI.   CLAIM FOR RELIEF

**Violation of 42 U.S.C. § 1983**
**Based on Deprivation of the Class Members' Rights to Speak and to Petition the Government for Redress of Grievances under the First Amendment to the United States Constitution**

58.     Plaintiffs incorporate by reference the preceding paragraphs of this Complaint as if fully set out in this paragraph.

59.     The class members were engaged in speech and petitioning activity protected by the First Amendment to the United States Constitution when they interacted with the press and public and worked from the patio outside the Masterman school building on August 26 and 27, 2021.

60.     The class members were speaking and petitioning "as citizens" about a matter of public concern and rather than pursuant to their duties as government employees when they interacted with the press and public and worked from the patio outside the Masterman school building on August 26 and 27, 2021.

61.     The District first demanded that the class members cease their First Amendment protected activity when it told them to work inside instead of on the patio, and then punished them for refusing to end their First Amendment protected activities by marking them as absent and docking their pay.

62.     The District ordered the class members inside the school building and disciplined

them to suppress their message and retaliate for the class members' First Amendment protected activities rather than for any legitimate reason.

63. The District did not have adequate justification to retaliate against the class members for their First Amendment protected activities.

64. The class members suffered damage as a result of the District's retaliatory actions in the form of a loss of First Amendment freedoms, lost wages and other employment benefits, and damage to their professional reputations from the discipline recorded in their employment records.

65. The District is a person acting under color of state law for the purposes of 42 U.S.C. § 1983.

66. Chief of Schools Dr. Evelyn Nunez made decisions in the events in question as a policy making official for the School District.

67. The unconstitutional retaliation against the class members were taken by District policy makers and ratified as a matter of official policy.

68. The class members are entitled to declaratory and injunctive relief, damages, and attorneys' fees under 42 U.S.C. § 1983.

VII.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court:

- a) enter a declaratory judgment that the District's actions were in violation of the First Amendment to the United States Constitution;
- b) issue a permanent injunction requiring the District to expunge the F-61s issued to the class members for working outside the Masterman building on August 26 and 27, 2021;
- c) award damages to the class members for their lost wages, plus interest;

d) issue a permanent injunction requiring the District to adjust, where applicable, the class members' compensation records to correct any loss of pension or other benefits resulting from the decrease in their pay as a result of the issuance of the F-61s on August 26 and 27, 2021;

e) order all compensatory relief necessary to cure the adverse effects of the District's unconstitutional retaliation against the class members and/or nominal damages;

f) award the class members their reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

g) order such other relief as this Court deems just and equitable.

           Respectfully submitted,

Dated: August 18, 2023

/s/Mary Catherine Roper
Mary Catherine Roper
PA Id. No. 71107
Irv Ackelsberg
PA Id. No. 23813
LANGER, GROGAN & DIVER P.C.
1717 Arch St., Ste 4020
Philadelphia, PA 19103
Tel: (215) 320-5660
Fax: (215) 320-5703
mroper@langergrogan.com,
iackelsberg@langergrogan.com

Seth Kreimer
PA Id. No. 26102
3501 Sansom Street
Philadelphia, PA 19104
(215) 898-7447
skreimer@law.upenn.edu

*Counsel for the Plaintiffs*